Our second case of the day is Legend Lake Property Owners Association v. Menominee County. Mr. Olson. May it please the court. Attorney Eric Olson for the appellees. The Legend Lake Property Owners Association, Incorporated. With me here in the courtroom is Mr. Jim Skolstad, who is representative of the Legend Lake Property Owners Association, Incorporated, and Anne and Timothy Houselock. A federal court's function is to protect individuals and groups against intentional discriminatory and disparate treatment. Those were Honorable Judge Griesbach's words on page 22 of his decision. And this case is about a discriminatory campaign that has been undertaken against our clients by the appellees in this matter. There are many instances in the wonderful and storied history of the federal courts in this country where courts have undertaken to try to correct ongoing problems that have come about oftentimes through historical injustices and sometimes simply through well-meaning actions that have gone awry. In this case, I believe both are involved. First, the sad story that the treatment that Native American peoples received often in this country. But secondly, the termination act of the Menominee tribe, which was a very sad part of history but was actually well-meaning at the time. And then the subsequent Restoration Act. And those two federal actions created the situation in which we now find ourselves where we have a town and a county that are coterminous with the boundaries of what was the Menominee Reservation created by the Treaty of Wolf River. But we have a number of taxpaying landowners within that area who find themselves in an extremely difficult situation. And we attach to our complaint in this case as Exhibit 4, a 63-page document that was created by a task force that came into being through an act of the Wisconsin legislature that was taken after the 1998 Legislative Audit Bureau report, which is also an exhibit to our complaint. And that obviously has, at least to some extent, the... Mr. Olson. Yes, sir. Time is short. You might wish to address the ground on which you lost in the district court. The district court said that you were asking for a remedy that a court cannot provide. You might want to address that question. Thank you, Your Honor. I believe that we showed examples in the Hutto case, the Brown case, the Horn case, the Zinke case, the Jackson case. Can you connect the Brown v. Board of Education to the Tax Injunction Act? Yes. The Tax Injunction Act, Your Honor, I don't believe applies in this case because this is not just a case of a state tax scheme that we're attacking. This is what we're calling a discriminatory campaign, and actually it's the result. That's what you're calling, but you're asking for relief that involves taxes. Let me put the question another way. The ordinary remedy for a takings claim is just compensation, cash. Did you ask the district court for an award of cash? No, Your Honor. We're asking for prospective injunctive relief. Well, that was the district court's problem, and it's what you need to address. Well, for example, if we look at a case like Hibbs v. Winn, which is at 542 U.S. 88, that dealt with prospective injunctive relief that had to do with tax credits that the state of Arizona was offering if people would give money to institutions that gave scholarships for religious schools, and that was a Ginsburg opinion that specifically said that just because something involves taxes does not mean that the Tax Injunction Act insulates it from every sort of 1983 challenge. And if this was as simple as a problem with the state tax scheme, which it isn't, we certainly wouldn't be in the position we're in right now. One point on that that concerned me somewhat, and I'd like to get your view on, are these baseball fields. What do they have to do with this whole thing? The baseball fields simply show where the town and county were acting against what would normally be considered their own interest in that they had engaged in a leaseback agreement where apparently they would have to give more money to the tribe, which would actually reduce the amount of revenues they had. That was the same thing that Justice Ginsburg found problematic about Arizona's scheme. And quite frankly, we see something very similar here. How often does one find a situation where a municipality, here the town and county, are actively trying to destroy their tax base? And that's exactly what's going on here. Tell me a little bit more about the facts here, Mr. Olson, if you would. How did they have to give what back to whom with respect to these fields? Oh, well, so the deal, so to speak, was that the contours of the deal were something along the lines that the town and county would give the middle school to the tribe, and then the tribe would lease some land to the town and county, upon which the town and county would then construct baseball fields that they would then pay rent to the tribe. And the point we were making with that is that it was one of many actions that add up together to a concerted effort to drive our clients out, to drive them away, to drive them off the property. The reason I'm asking about this is on that transaction, I find it hard to see how it's connected to taxation. If it's not connected to taxation, then we're not talking about the Tax Injunction Act or COMETI. Exactly, because the whole case is not really connected to taxation. It's connected to a discriminatory campaign. Allowing properties that have been placed into the trust to become dilapidated is not part of a tax scheme. Potentially some of the discriminatory attacks involve taxation, but fundamentally this is not an attack on Wisconsin's tax system. Wisconsin's tax system was doing just fine until the federal government came in and essentially blew it up with the Termination Act and the Restoration Act, which created an untenable situation. And what I was getting to is that on page 27 of the task force report, which is document 2, I'm sorry, Exhibit 4 to our complaint, there's actually the task force said appealing to the federal government for assistance in the Menominee area. And in large, bold letters, the task force, which was writing on State of Wisconsin letterhead, said the task force requests that the federal government provide financial assistance to Menominee County. The task force requests that the governor and the Wisconsin congressional delegation work with the U.S. government to create an assistance program for Menominee County and other similarly situated counties in the United States, which I believe there are none, but if there were. And then if we look at the Legislative Audit Bureau report, that's page 3 of Exhibit 3. The last paragraph of that to our amended complaint says, Meanwhile, the state will need to pursue federal legislation that will cause the federal government to assume greater responsibilities for the financial burdens associated with federal trust land. There is also need to clarify federal, state, and tribal jurisdiction in criminal and civil regulatory matters. So I take that as strong evidence that the State of Wisconsin was not seeing this as a problem or a challenge to the otherwise fairly well-working state tax scheme that works perfectly well for all the other counties. This is a problem unique to this county, caused by Congress and the executive branch, obviously, which ratified the Termination Act and the Restoration Act, that have created an untenable situation. This is an injustice and a problem that's been pervading through time, and in a strange sense the town and the county are actually taking concerted actions that will reduce their own tax base. They will kill the goose that's laying the golden egg, and that's exactly what Justice Ginsburg found problematic in the Wynn case. She said this. So is the contingent is that the assessments of the values of the home and the property taxes are excessively high, but the end goal is to push that 1% that's left out of the county? That is exactly our contention, Your Honor. That is exactly our contention. That the goal is to expel our clients from the county and then return the land to the trust. Well, to the trust. To the trust, which will be essentially for the use of the tribe. And it's an entirely foreseeable result of the sad historical occurrence of events, but we are crying out to the federal judiciary for help. If there were another place that we could have thought of to try to remedy this situation, we would have gone there. The United States Congress has other things on their mind. The State Congress will run into a buzzsaw if they try to do it. The State Assembly and Senate and Governor, even were they try to legislate their way out of this, they themselves run into a comedy problem, because comedy, as the younger case points out, goes both ways. And, in fact, on pages 44 and 45 of Younger v. Harris, we have the Supreme Court saying what the concept, and here they're talking about federalism, but federalism and comedy are closely intertwined. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both state and national governments, and in which the national government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states. It should never be forgotten that this slogan, Our Federalism, born in the early struggling days of our union of states, occupies a highly important place. So we have, this is a federal problem. This is a federal issue created by two pieces of federal legislation and the unique relationship between the federal government and a dependent sovereign nation, which is the Menominee. I would like to reserve the rest of my time. Let's go to my counsel. Mr. Steffek. Good morning, Your Honors, and may it please the Court. My name is Tony Steffek. I represent the Menominee Indian School District in this case. And Judge Griesbach did a really good job of explaining why the plaintiff appellants did not have standing to bring this case due to lack of redressability as well as… Can you tell me how his rationale applies to these baseball fields? These baseball fields seem pretty remote from taxation, and that's bothering me. I completely agree, Your Honor, and I need to correct the record. What happened here is that the Menominee Indian School District owned a middle school building in Neopet, Wisconsin, which is within its boundaries. It was old, and what the district decided to do was hold a referendum to build a new high school. And as part of that, the middle school would move into the old high school. Now, the Menominee Indian Tribe of Wisconsin liked the building in Neopet to hopefully use for whatever purpose they wanted to use it for. So what ended up happening is the district agreed to sell that building to the Menominee Indian Tribe of Wisconsin for $1. In exchange, there was property which is colloquially known as the Tucker property, which was trust land right next to where the new high school was going to be. And there are complications about the trust land being sold to the public school district. There's a whole lot of red tape and everything else like that. So what the parties agreed on is, in exchange for the dollar sale of the surplus middle school building, the Menominee Indian Tribe of Wisconsin leased 10 acres of property, the Tucker property, to the district for $1 a year for 75 years. And on that parcel was built an athletic sports complex that both the school district as well as the community at large uses. That's what happened here. And what the plaintiff is alleging is that that was part of a conspiratorial scheme to get fee-owning property members off of, to get them to move out so that way the Menominee Indian Tribe of Wisconsin could take over. And that, I appreciate your question, Judge. It leads to my first point. Menominee Indian School District is a public school district in Wisconsin. There are 421 of them in the state, and we're one of them. And the laws that apply to public school systems in Wisconsin apply equally to the Menominee Indian School District. For example, Wisconsin Statute Section 120.12 sub 1 talks about the power of school boards. And there's some language about an annual meeting, which is a procedural thing in the school district law. And it says, school boards shall have the possession, care, control, and management of the property and affairs of the school district. So this whole thing about the baseball fields and the middle school, this was a decision that the elected body for the school board decided to make, which was its right. Another part that's really important here is that the taxation laws for public schools are as nasty as they do every other school district. And the way it works, it's complicated, but at the end of the day, each school district has a levy cap that it can levy upon its taxpayers. The school board makes a decision as to how much of that levy cap it needs to operate its district. And it decides on that levy. And what it does is it takes that levy number, sends it to the town of Menominee, which is the taxation district, and they divvy it up on all of the taxable parcels. That's the only role in property taxation that a Wisconsin public school district holds. So there are other things that also apply that are central to some of the problems that are being alleged here. For example, the district decided its students and community deserved a new high school. So what did it do? It held a referendum, and the referendum passed. And therefore, the school district was authorized to borrow money. And it borrowed money within the limit of borrowing that it could. That is not a conspiratorial theme. That's a school district decision. Nothing that the plaintiff appellant is alleging MISD did violated any law. All of its actions were taken within the statutory framework that governs it as a Wisconsin public school district. The argument is that the $52 million high school had, in essence, a discriminatory purpose. That this was done in a way where the taxpayers were not able to weigh in on how this was going to be done and why. And so how would we kind of respond to our colleague on the other side as to it appears as though this was the reason that was offered, but really underneath that, it was to ensure that the $52 million project was completed without taxpayer buy-in? There was taxpayer buy-in to the extent I'm understanding your question, Your Honor, is that there was a referendum that was held, and it passed. And it passed resoundingly, as well as there are school board elections where school board members are elected. And they made the decision to present the referendum to the community, and the community approved it, which is its right under applicable laws. What's really going on here is that the problem that the appellants have is that they feel that they're outnumbered. They feel that there are a lot of members of the Menominee Indian Tribe of Wisconsin who reside within MISD's borders that voted in favor of the referendum and that voted in favor of their school board members, which is their right. They have the right to vote. They have the right to make their decision. The plaintiffs appellants don't like that decision, and they don't like it because they have to pay property taxes. They own taxable property, whereas the vast majority of the territory within MISD's boundaries is held in trust for the MITW. There's nothing that the Menominee Indian School District can do about that. We can't levy property taxes upon those properties. We can't. But we still have kids to educate. We still have a school district to run, and these are decisions that were made. Now, it brings up another good point that I want to bring up in response to my colleague. The Restoration Act, which has been pretty central to this entire lawsuit, the Restoration Act was passed in 1973. The Menominee Indian School District didn't come into existence until 1976. It was formed out of a different school district, the Shawano School District in Wisconsin. The entire existence of the Menominee Indian School District has been with the Restoration Act in place. So counsel made a comment about the tax system was doing just fine until the Restoration Act. Right, wrong, or indifferent, the fact of the matter is that the taxation system post the Restoration Act has applied to the MISD the entire time. There has been no difference. And the Wisconsin legislature has decided how schools are going to be funded in Wisconsin, and our client followed those rules. Another theme that the plaintiff appellant has addressed is that they don't have anywhere else to go. We heard about that this morning. We don't have anywhere else to go. We've heard that a lot in this case, that they don't have access to the ballot box. But they do. The Wisconsin legislature sets the taxation system that MISD and every other school district operates under. We use it the same way as the Milwaukee public schools, the Green Bay public schools, the La Crosse public schools. If the petitioners don't like the taxation system that applies to public schools, that's an issue for them to take up with the state legislature to see if they can get change. Same thing applies on the federal level. The federal law says that land held in trust for Native American tribes cannot be taxed. So even if MISD wanted to spread out its property tax levy even more under those properties, by law it can't. There is nothing MISD can do about it. So it's not the school district ballot box that's key. It's the federal and state ballot boxes that should be pursued, and that doesn't make a federal case. My time here is limited, and I want to make two other things really clear. No matter what happens in this case, and this pertains to redressability, no matter what happens in this case, what you all decide to do, what any other court decides to do, and what Menominee Indian School District decides to do, nobody can stop the Menominee Indian Tribe of Wisconsin from purchasing properties. If it wants to purchase property within the former boundaries of its reservation, it has every right to do that. And on the flip side, everybody has a right to sell their property to the Menominee Indian Tribe of Wisconsin if he, she, or it wants to. There is nothing we can do to stop that. So to the extent this case hinges on this theory of, well, eventually our properties are going to be rendered useless and valueless because MITW keeps buying properties, even if that were true, which we of course dispute, there's nothing that can be done about that. MITW is free to do what it wants. So I have 25 seconds left. What I'd like to say is... I'm puzzled by this claim that they're free to do whatever they want. If this whole setup after the 1973 Act amounts to a taking, then there has to be just compensation. The peculiarity of this case is the plaintiffs don't want what appears to be the only authorized remedy in a takings case. The Supreme Court has said you can't get equitable relief in a takings case. What you get is money. The plaintiffs say we don't want money, therefore we're entitled to equitable relief. Well, that is a problem, is it not? I 100% agree, Your Honor. What they want is equitable... Is the school district ready to pay the just compensation award in a takings case? That's obviously not this case, because the plaintiffs have sworn off a request for money. But the Supreme Court has said that's the only relief available in a takings case. Correct. There's a couple layers to your question, Your Honor. Are they ready to pay it? Well, presumably they could, but only if they committed a taking. And our position, of course, is that by issuing a property tax levy and making decisions, that doesn't amount to a taking. That amounts to a school district operating within the confines of the law. I very much appreciate your time. Thank you very much. Thank you, Mr. Stavik. Mr. Landgraf. Good morning. May it please the Court, my name is Kevin Landgraf, and I represent the Menominee County and Town of Menominee. As many of the issues we addressed in our briefing were touched on by the other parties, I'll try to keep my issues brief. And more directly correlated to my clients, the county and townie. As Attorney Stavik had indicated, the MISD is the taxing jurisdiction in this case, the Menominee County and Town synonymously are the taxing district. In a case such as this, the MISD, as Attorney Stavik indicated, levies the taxes to the county, and then we issue the tax bills to the property owners. As indicated in our briefing, the district court correctly dismissed the case on three independent grounds. The plaintiffs lacked standing because of the lack of redressability. The Tax Injunction Act bars jurisdiction, and the principles of comedy independently require dismissal. Talk through how the Tax Injunction Act, that second independent reason, how does it apply here? Your Honor, the Tax Injunction Act bars the federal courts in Article 3 to oversee state taxation issues. And because of the allegations that are made in the complaints, these are state taxation issues. There is a state avenue or state remedy available, which was indicated on page 25 of Judge Griesbach's decision, where they could pursue this in state claim and as directed to the county and town. In the state court? In the state court, sorry. Via state claim. And as indicated in that decision, there's an omissions statute, specifically Section 70.44, and omissions from tax rolls, which likely is what the claims against the county and town here would fall under, due to the allegations in the complaint that properties are being withheld from the tax roll, but also not being placed in the trust. When I was saying to speak to it, I'm sorry. Counsel for the other side has said this is not a tax case. This is a case identifying, highlighting the discriminatory practices that are going against the property owners who pay taxes. And he alluded to some of the Brown v. Board of Education and other cases that highlighted the injunction that they're requesting is to stop the discrimination. And so when I was asking to speak to that, with that characterization, and that's why the Tax Injunction Act would not come into play. Your Honor, if I'm understanding correctly, the Tax Injunction Act would still come into play because the practice by which they're alleging their 1983 claims under would fall under a taxation practice. And courts have held in the Supreme Court and the Seventh Circuit where, just because allegations are amassed as a 1983 claim, doesn't prevent the Tax Injunction Act from being applied. Speaking to that, the Tax Injunction Act, it kind of brings us to the question of, what is it that this court can do or what the district court could have done? And Judge Griesbach had indicated in his decision, there's not much here that Article III powers grant this court to be able to do. The redressability is certainly an issue, but put it plainly, plaintiffs here seek declaratory judgment and injunction, which begs the question, what would that look like? In Brown v. Board of Education, which was indicated in the opening argument, as well as at the district court, it's put plainly. We want desegregation in the schools. That's very specific. Here, we don't know what exactly, until the plaintiff's reply brief, or their moving brief at the Court of Appeals, what does that relief look like? And even then, the district court found that it was too broad. You're asking the district court to act as a legislator and enforce taxation issues in the state. And Article III does not grant the court that type of power. Turning to the declaratory relief, similarly, the district court found that, what would a declaration here do? Sure, the county and town, maybe MISC, if they find that it's acting unconstitutionally, how would that resolve the plaintiff's claims? There's no claim here for, as Judge Easterbrook indicated, there's no claim here for a refund of taxes. There's no claim for cash money back due to the unconstitutional takings here. So it begs the question, what is it that plaintiffs are seeking? As Attorney Olson had indicated in his opening argument, this might be a federal issue, but it's not a federal issue for the federal courts. It is a legislative issue. It's an issue that might be brought up at the State Assembly. It might be brought up in Congress. It would certainly be a judicial issue if the plaintiffs wanted money. I'm sorry, Your Honor, what was that? It would certainly be a judicial issue if the plaintiffs wanted money. This is a case about remedies. But as long as the plaintiffs don't want money, the question is, can they force the judge by forswearing money to award equitable relief? It's our position, Your Honor, that no, they cannot. Thank you very much for your time today. Thank you, Mr. Landgraf. Anything further, Mr. Olson? A few things. First of all, Your Honor, in addition to being a takings case, we've pled it also as a 14th Amendment equal protection case. And if you look at cases like Hutto, there were a whole lot of things that were wrong in that prison system. And it actually started out as a pro se complaint that the judge assigned attorneys to. They had a hearing, and it went through a whole series of hearings before the equitable relief was determined. We said in our complaint that we wanted equitable relief addressing the issues that were pled. But it would do us very little good if other discriminatory tactics were then simply thought up to try to accomplish the same thing, which is to drive our clients off the land. So your contention is that you don't have to go through the state court system because you're not pursuing money damages. Correct. And the contention that we could use the sort of patchwork of remedies under 74.35 and 74.33 and 70.44, these are all sort of rebate statutes that are meant to correct really just good faith errors in the taxing system, not a structural remedy to fix problems that are discriminatory in nature. The declaratory relief, as we cited, is often in the Bonkowski case, I believe, is often a prelude to injunctive relief. And Judge Griesbach relied heavily on the Giuliana case. And I submit that the other cases that we've cited, like Hutto, Brown, Zinke, these are cases which were complicated cases, but were nevertheless the federal courts stepped in to provide equitable relief to prevent violations of the Constitution. As to the contention by opposing counsel that there was a referendum and an election for the school board, we plainly pointed out in the complaint that the vast overwhelming majority of the voters are not taxpayers. So it's a strange situation where there's no relief available at the ballot box. The existence of MISD, which was also brought up, is also a problem because in the Native American Rights Fund, upon which Congress presumably relied in enacting the Restoration Act, and this is actually cited right in our complaint, there's a section that says, well, there won't be a problem with school funding because it's part of the Shawano School District. So they felt for a variety of reasons that the school funding problem would not emerge. As we see, the school funding problem has emerged. If it was $52 million that was expended to help the students and to ensure great education, we wouldn't have a problem. If there's a discriminatory animus to drive us off the land, that is a black-and-white violation of the 14th Amendment. Thank you. Thank you, Counselor. The case is taken under advisement.